## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| TAMMY BERGBAUER | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil No. 09-1032 (RCL) |
| RAY MABUS, SECRETARY OF THE NAVY | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Defendant Secretary of the Navy ("Navy") renews its Motion [57] for Summary Judgment as to plaintiff Tammy Bergbauer's claim of hostile work environment based on sexual harassment and retaliation.

Bergbauer sued Navy and Rear Admiral ("RDML") Charles H. Goddard in June 2009, alleging sexual harassment and hostile work environment claims under Title VII (Counts I and II) and the D.C. Human Rights Act (Counts III and IV), as well as battery against Goddard and intentional infliction of emotional distress against Goddard and Navy. The Court granted Goddard's motion [18] to dismiss and granted in part Navy's motion [7] to dismiss, [1] *see* Order,

---

[1] The Court dismissed all counts against Goddard and all but one against Navy. Bergbauer's Human Rights Act claims were dismissed as preempted. Mem. Op. at 9–10 (quoting *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 835 (1976)). The Title VII sexual harassment claim against Navy was dismissed because Bergbauer did not allege tangible employment action as a result of the harassment or her refusal to submit to a supervisor's demands. *Id.* at 10. The IIED claim against Navy was dismissed after Navy asserted sovereign immunity and Bergbauer failed to respond, and because the claim was preempted by Title VII. *Id.* at 13. Finally, Title VII preempted Bergbauer's IIED claim against Goddard, and the statute of limitations barred her battery claim against Goddard. *Id.* at 13–14. Although the Order accompanying the Court's Memorandum Opinion failed to dismiss Count I against Navy, this omission is moot given that the Court now dismisses the case.

ECF No. 38; only one count remains against Navy alleging a hostile work environment based on sexual harassment and retaliation.

Upon consideration of Navy's renewed motion for summary judgment, Bergbauer's Opposition [60], Navy's Reply [64], the entire record in this case, and the applicable law, the Court will GRANT the motion for summary judgment and dismiss the case.  Bergbauer has not shown conduct sufficiently severe or pervasive to make a case of hostile work environment based on sexual harassment.  While her retaliatory hostile work environment claim presents a closer case, she has not shown that the alleged conduct was sufficiently severe or pervasive or that it was causally connected to her protected activity.

## I.      BACKGROUND

Plaintiff Tammy Bergbauer was hired as a civilian program analyst, subject to a one-year probationary period, by the Naval Sea Systems Command (NAVSEA) Headquarters of the Department of the Navy in July 2007.  Def.'s Stmt. Mat. Facts Not in Dispute ¶¶ 1–2, ECF No. 57-1 [hereinafter Def.'s SMF]; Pl.'s Resp. to Def.'s SMF ¶¶ 1–2, ECF No. 60 [hereinafter Pl.'s SMF].  Bergbauer became Director of Corporate Operations two months later and had human resources responsibilities.  *Id.*  Bergbauer's direct supervisor was then Alan Weyman; Weyman and Bergbauer reported to RDML James McManamon.  Def.'s SMF ¶¶ 3–4; Pl.'s SMF ¶¶ 3–4. Bergbauer also reported to RDML Goddard.  Pl.'s SMF ¶ 4.

### A.      Alleged Hostile Work Environment Based On Sexual Harassment[2]

---

[2] Throughout the Opposition, Bergbauer improperly cites to her Amended Complaint, rather than the record, to support her allegations.   "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Where the plaintiff has cited solely to the Amended Complaint, the Court has relied on the parties' statements of material facts not in dispute and has examined the record to determine if there are facts showing a genuine issue for trial.

Bergbauer's sexual harassment hostile work environment claim stems from events occurring from fall 2007 through April 2008. Specifically, Bergbauer alleges that her co-worker Cameron Towner made unspecified compliments regarding her appearance, "several inappropriate suggestive comments," and one sexually explicit remark. Def.'s SMF ¶ 6, Pl.'s SMF ¶ 6. Towner allegedly told Bergbauer that his ideal way to spend a day of bad weather would be with "Disco lights, White Russians, tomatoe [sic] soup, grilled cheese, you & me." Def.'s MSJ, Ex. 5, ECF No. 57 (including Towner's acknowledgement that he discussed soup and sandwiches but not that he added "you and me"). Towner also allegedly said, "I've always wanted to be like Mr. Weyman . . . and have you in this office behind closed doors, all alone, all by myself." *Id.* On another occasion, Towner encouraged Bergbauer to attend a work tailgate, stating that she "would have a good time" and that he had "special liquor" for the two of them to "get liquored up before the game." *Id.* Finally, on April 22, 2008, when Bergbauer stated that she needed gum to freshen her breath after eating tuna, Towner told a story about why he had stopped eating tuna that involved a crass joke about oral sex. *Id.*

Bergbauer also alleges that, during official travel to San Diego, CA, on February 8, 2008, RDML Goddard inappropriately touched and kissed her. Def.'s SMF ¶ 5, Pl.'s SMF ¶ 5. Specifically, Bergbauer, Goddard, and two other individuals employed by Navy, went out for dinner, drinks, and dancing after a work event. The group drank heavily, with each person consuming five shots of tequila along with multiple beers and/or margaritas. Def.'s MSJ, Ex. 4; *see also* Pl.'s Opp'n, Ex. P, at 2, ECF No. 60. During the evening, Bergbauer alleges that Goddard inappropriately touched her by sliding his hand around her back; giving her waist "a slight squeeze . . . as if to emphasize certain points and/or to assure he had [her] attention . . . "; pushing his socked foot between her legs during dinner; trying to grab her hand or arm while the

two walked; putting his hand below her shirt to touch her back; putting his hand along her waist and moving upward toward her breast; and finally kissing her "on the mouth for a split second before he pushed his tongue into [her] mouth." Def.'s MSJ, Ex. 4 at 3–7. The other individuals present did not recall seeing any inappropriate touching or kissing and Goddard said he could not recall whether he had touched her. Pl.'s Opp'n, Ex. P at 8–11, 36. At this stage, the Court assumes the truth of Bergbauer's evidence regarding the evening.[3]

On February 10, 2008, Bergbauer reported Goddard's conduct to her mentor, Sam Samimi, a supervisor with the Department. Pl.'s Opp'n, Ex. C, ¶¶ 4–5, 7. Samimi then reported it to Bergbauer's supervisor, Alan Weyman, though the content or extent of that conversation is not in the record. Id. ¶ 6. Bergbauer has made conflicting statements regarding whether she intended to pursue corrective action or invoke the EEOC process when she reported Goddard's conduct to Samimi. Because this is not ultimately relevant to the Court's reasoning or decision, the Court does not consider it futher.

After Towner's sexually explicit remark to Bergbauer on April 22, 2008, she complained to Weyman and asked him to speak with Towner. Def.'s SMF ¶ 7, Pl.'s SMF ¶ 7. When Towner was not immediately disciplined, Bergbauer asked Weyman to speak to RDML Goddard, who was Towner's direct supervisor. Id. Bergbauer asked that Towner be removed from employment in light of the Navy's "zero tolerance" policy on sexual harassment.

Within three days, Navy had directed an investigation into the allegations against Towner and he was subsequently removed from employment. Def.'s SMF ¶¶ 8, 10; Pl.'s SMF ¶¶ 8, 10.

In mid-May 2008, Bergbauer was questioned by the Naval Inspector General (NAVINSGEN) after an anonymous third-party complained about Goddard's conduct on the San

---

[3] Bergbauer now states that "[a]t least three men routinely sexually harassed" her at work. Pl.'s Mem. P. & A. in Support of Pl.'s Opp'n 1 [hereinafter Pl.'s Mem. P. & A.]. However, she never provides additional detail about the third man and so the Court will not consider that allegation further.

Diego trip.  Def.'s SMF ¶ 11; Def.'s MSJ, Ex. 6.  As a result, Bergbauer personally reported Goddard's conduct to Weyman for the first time.  Def.'s MSJ, Ex. 6.  The NAVINSGEN investigation concluded that, on several occasions, Goddard had been publicly intoxicated in the presence of subordinates and that the "instance of inappropriate touching of Ms. Bergbauer while intoxicated constituted being drunk and disorderly and was conduct unbecoming an officer and gentleman, in violation of Article 133, UCMJ."  Pl.'s Opp'n, Ex. P, at 38.  Goddard was relieved of his position on July 3, 2008.  Def.'s SMF ¶ 13; Pl.'s SMF ¶ 13.

### B.    Alleged Retaliatory Hostile Work Environment

On July 1, 2008, upon Weyman's retirement, RDML McManamon met with Bergbauer and informed her that Mark Deskins would be her new supervisor.  Def.'s SMF ¶ 18; Pl.'s SMF ¶ 18.  The Admiral told Bergbauer, "you're going to make me happy . . . you're not going to do to me what you did to the other admiral . . . your supervisor is going to put in your appraisal what I tell him to put in your appraisal."  *Id.*  Bergbauer "begged" McManamon not to assign her to Deskins because Deskins had previously "made it clear that he didn't like [her]" and spoke down to her staff.  Def.'s MSJ, Ex. 3, at 29–30; *see also* Pl.'s Opp'n, Ex. L, at 4 (in sworn testimony to NAVINSGEN on July 8, 2008, Bergbauer stated, "Everyone knew that . . . [we] . . . just don't get along at all.").  Bergbauer later made a presentation to McManamon, Weyman, and two others to provide examples of Deskins' interference with "the processes and duties and responsibilities that [fell] under [her] rein, and how it had been detrimental."  Def.'s MSJ, Ex. 2, at 114–115.[4]  Bergbauer was nevertheless assigned to Deskins.

---

[4] Bergbauer testified that, at some point around this time, Deskins was overheard by a witness willing to testify as saying that "what was being done to the Admiral was wrong, and [Bergbauer] needs to pay for this."  Pl.'s Opp'n, Ex. D at 13.  However, the Court will not consider this evidence for purposes of summary judgment.  Although a nonmoving party need not produce evidence "in a form that would be admissible at trial in order to avoid summary judgment," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), the evidence must be "reducible to admissible evidence," *Catrett v. Johns-Manville Sales Corp.*, 826 F.2d 33, 38 (D.C. Cir. 1987).  There are two problems with the evidence presented.  First, it is hearsay within hearsay; Bergbauer states that a second witness overheard

On July 3, 2008, the day Goddard was relieved of his position, Goddard met with a number of employees.   According to the parties' statements of material facts, Goddard announced he was being removed because Bergbauer had "gone after him."   Def.'s SMF ¶ 20; Pl.'s SMF ¶ 20.[5]   Prior to that time, only a small group of people knew that Bergbauer had complained about Goddard.   *Id.*

While Bergbauer was working under Deskins, she alleges that he engaged in a number of actions in retaliation for her complaint against Goddard.   On July 17, 2008, the last day of Bergbauer's one-year probationary period, Deskins spoke with RDML McManamon about terminating her, as he had done "on a daily basis throughout her probationary period."   Def.'s SMF ¶ 21; Pl.'s SMF ¶ 21.   Deskins gave Bergbauer at least one assignment to complete in a short period of time and told her to "figure it out" when she said she would have to work over the weekend.   Def.'s SMF ¶ 22; Pl.'s SMF ¶ 22.   He told her to post certain information on the wall of a conference room and when an admiral complained that the information should have been shared with him first, Deskins did not come to Bergbauer's defense.   Def.'s SMF ¶ 23; Pl.'s SMF ¶ 23.   Deskins requested cancellation of the selection certificate for two executive assistants and put a stop on a recruitment action without informing Bergbauer.   Def.'s SMF ¶ 24; Pl.'s SMF ¶ 24.   He also sent emails about work-related matters for which Bergbauer had responsibility without copying her, and went to meetings without telling her.   Def.'s SMF ¶ 28; Pl.'s SMF ¶ 28.

---

Deskins' comment.   Second, even if the cited witness were to testify, the comment would remain hearsay unless it falls under the opposing party statement exception to the hearsay rule.   *See* Fed. R. Evid. 801(d)(2).   However, the Court lacks evidence with which to make this determination and thus will not consider the statement now.   As to Bergbauer's allegation about RDML McManamon's comments (i.e. that "you're doing to make me happy . . . your supervisor is going to put in your appraisal what I tell him to put in your appraisal") and Goddard's comment that Bergbauer had "gone after him," the Court need not determine whether these statements are reducible to admissible evidence because Navy has conceded them.   Def.'s SMF ¶¶ 18, 20.

[5] A NAVINSGEN investigation into Goddard's remarks revealed conflicting reports of the meeting.   NAVINSGEN called the comments "unfortunate" but found they did not rise to the level of misconduct.   Pl.'s Opp'n, Ex. Q.   For purposes of summary judgment, the Court assumes that Goddard said Bergbauer had "gone after him."

He asked her to complete redundant tasks and complained to senior leadership that she failed to timely finish tasks.  Def.'s SMF ¶¶ 26–27; Pl.'s SMF ¶¶ 26–27.  Deskins cancelled, at the last minute, a work trip Bergbauer had planned.  Def.'s SMF ¶ 29; Pl.'s SMF ¶ 29.  He once asked, outside of Bergbauer's presence, that she be "fired and arrested"[6] because he believed she had harassed another employee.  Def.'s SMF ¶ 30; Pl.'s SMF ¶ 30.  During a staff meeting he compared her to coarse grit sandpaper.  Def.'s SMF ¶ 32; Pl.'s SMF ¶ 32.  He once told her that she did a lot of complaining and that she'd "already gotten rid of two people."  Def.'s SMF ¶ 33; Pl.'s SMF ¶ 33.  Finally, in January 2009, before he left for another job, Deskins gave Bergbauer a letter of reprimand and a poor performance review which included a rating of three out of five.[7]  Def.'s SMF ¶ 31; Pl.'s SMF ¶ 31.  Although it is unclear from the parties' submissions, it appears that Navy employees' performance ratings are tied to financial rewards such that, if Bergbauer's rating had been higher, she would have received a slightly higher salary increase or bonus possibly on the order of an additional 1–2% of her salary.  *See* Def.'s MSJ, Ex. 10, at 2 (assigning Bergbauer two "shares" and an apparently corresponding  "performance payout" salary increase); *id.*, Ex. 12, at 2 (assigning Bergbauer three "shares" and a "performance payout" distributed as a salary increase and bonus); *id.*, Ex. 10, at 13 (corresponding "rating of record" with number of available "shares").

---

[6] Although Navy states that Deskins asked that Bergbauer be arrested, it is unclear whether this actually occurred or when it may have happened.  The exhibit to which Navy points in support states only that he asked that she be fired and escorted from the building, not that she be arrested.  A separate statement by Bergbauer suggests that Deskins asked that she be arrested, though the statement is hearsay within hearsay and was not corroborated by the party who allegedly provided the information to Bergbauer.  *See* Pl.'s Opp'n, Ex. D, at 105–08.  It also appears that the incident may have occurred in late June 2008, before Deskins became Bergbauer's supervisor.  *Id.*  For purposes of this motion, the Court will assume that Deskins asked that she be arrested since both parties have agreed to this version of the facts.

[7] The performance review Navy attaches as an exhibit to its Motion is not signed by Deskins and nowhere lists his name.  Because both parties have stipulated that Deskins wrote the review and determined Bergbauer's rating, the Court will assume the review was written by Deskins.  Def.'s MSJ, Ex. 10.

After Deskins left in January 2009, her new supervisor wanted to give her a performance rating of four for the period ending in September 2009, but senior leaders decided she deserved a three. Def.'s SMF ¶ 34; Pl.'s SMF ¶ 34. Bergbauer's performance rating increased to a four for the period ending September 2010.

Bergbauer also alleges that she was unfairly assigned to a GS-14 pay level rather than a GS-15 when civilian employees in the Navy were transferred to the General Schedule pay system in February 2011, while this suit was pending. *See* Pl.'s Opp'n 24.

Finally, Bergbauer alleges for the first time that she was stripped of several important aspects of her job, including authority over IT and security. Pl.'s Mem. P. & A. 8.

Bergbauer first contacted an EEO Specialist in NAVSEA on July 11, 2008, to lodge an informal complaint of discrimination against Goddard and Towner. Def.'s MSJ, Ex. 7 ¶¶ 1, 5. She filed a formal complaint on September 15, 2008 for discrimination based on sex, reprisal, and hostile work environment. Def.'s MSJ, Ex. 9. According to her Amended Complaint, she was issued a "right to sue" letter on September 16, 2008. Am. Compl. ¶ 44. Bergbauer filed the instant suit on June 3, 2009.[8]

### C.    Renewed Motion for Summary Judgment

Navy now renews its motion for summary judgment. With respect to Bergbauer's sexual harassment hostile work environment claim, Navy argues that Bergbauer failed to timely exhaust

---

[8] It is unclear whether Bergbauer timely filed this action but Navy has waived any defense based on this point. By statute, Bergbauer was required to file her civil action within ninety days of receipt of the right to sue letter. *See* 42 U.S.C. § 2000e-5(f)(1). However, the D.C. Circuit has also held that "Title VII complainants must wait 180 days after filing charges with the EEOC before they may sue in federal court." *Martini v. Fed. Nat. Mortg. Ass'n*, 178 F.3d 1336, 1347 (D.C. Cir. 1999). *Martini* did not address how this 180-day waiting period would interact with the 90-day time limit for filing suit when plaintiff's immediately receive a right to sue letter. Regardless, the 90-day time limit is not jurisdictional and is subject to waiver. *See Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982). Although Navy has argued that Bergbauer failed to exhaust her administrative remedies by initiating EEO contact over 45 days after the alleged harassment, Navy has never challenged the timeliness of her filing.

her claim of harassment by Towner and that her claim of sexual harassment by Goddard is not part of the same unlawful practice as that by Towner and thus should not be considered further.

With respect to Bergbauer's retaliatory hostile work environment claim, Navy argues that the facts alleged do not establish a pattern of "severe" or "pervasive" conduct that altered the conditions of Bergbauer's work environment and that Bergbauer has failed to show a causal link between her protected activity and the alleged retaliation.

## II.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment should be granted when "the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphasis added); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A fact is material if it could affect the outcome of the case.  *Id.*  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* The "evidence of the non-movant is to be believed, and all *justifiable* inferences are to be drawn in his favor."  *Id.* at 255 (emphasis added).  The non-movant, however, must establish more than "the existence of a scintilla of evidence" in support of his position, *id.* at 252, and may not rely solely on allegations or conclusory statements.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C.Cir.1999); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

### B.   Title VII Generally

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of

employment, because of . . . sex." 42 U.S.C. § 2000e-2(a).  Title VII separately makes it "an unlawful employment practice for an employer to discriminate against any [employee] . . . because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge" under the subchapter.  42 U.S.C. § 2000e-3(a).  Thus, retaliation is also prohibited.

Section 2000e-16(a) makes Title VII applicable to federal agencies, and although the language of that provision differs slightly from sections 2000e-2(a) and 2000e-3(a), the D.C. Circuit has held that Title VII "'places the same restrictions on federal . . . agencies as it does on private employers'" and that courts may "'construe the latter provision in terms of the former.'" *Singletary v. Dist. of Columbia*, 351 F.3d 519, 524 (D.C. Cir. 2003); *Taylor v. Solis*, 571 F.3d 1313, 1320 (D.C. Cir. 2009).[9]  Thus, federal employees may bring claims for both sexual harassment and retaliation.

### C.    Method of Analysis for Hostile Work Environment Claims Based on Both Sexual Harassment and Retaliation

Bergbauer's Amended Complaint alleges a single hostile work environment claim based on sexual harassment and retaliation; however, it is not obvious they may be analyzed as a single count.  In moving for summary judgment, Navy has addressed them as distinct claims and Bergbauer, in responding to the motion, does not appear to dispute this characterization.

Courts in our circuit have taken differing approaches to hostile work environment claims grounded in both retaliation and substantive discrimination.  *Compare Baloch v. Kempthorne*,

---

[9] Although the Supreme Court has not explicitly held that federal employees may bring retaliation claims under Title VII, its precedent suggests that it would.  *Compare Gomez-Perez v. Potter*, 553 U.S. 474, 488 n.4 (2008) ("While the federal-sector provision of Title VII does not incorporate [the antiretaliation provision in ] § 2000e–3(a), the federal-sector provision of Title VII does incorporate a remedial provision, § 2000e–5(g)(2)(A), that authorizes relief for a violation of § 2000e–3(a).  The Federal Government . . . has declined to take a position on the question whether Title VII bans retaliation in federal employment and that issue is not before us in this case.") *with id.* at 487, 491 (holding that the ADEA, which contains a federal-sector provision "patterned 'directly after' Title VII's federal-sector discrimination ban," prohibits retaliation against a federal employee and allows that employee to bring a private cause of action based on retaliation).

550 F.3d 1191, 1201 (D.C. Cir. 2008) (appearing to analyze hostile work environment claim based on discrimination and retaliation as a single claim), *and Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 93 (D.D.C. 2009) (dismissing hostile work environment claim based on discriminatory and retaliatory motives), *with Whorton v. Wash. Metro. Area Transit Auth.*, 11-cv-1291-RC, 2013 WL 633046 (D.D.C. Feb. 21, 2013) (separately analyzing claims of hostile work environment based on race, gender, and retaliation).

The Court holds, at least in this case, that it is more appropriate to address Bergbauer's hostile work environment claim as two distinct claims. Retaliation and sex discrimination are made unlawful employment practices in separate sections of Title VII and appear to be distinct unlawful practices despite both being actionable as hostile work environment claims. 42 U.S.C. § 2000e-2(a); 42 U.S.C. § 2000e-3(a). In this case, with the exception of the single comment by Goddard that plaintiff had "gone after him," the alleged retaliation was committed by different actors than the alleged sexual harassment and seems to have been motivated by a different animus.[10]

The Supreme Court's language and holding in *Morgan* support this conclusion. There, the court noted that a "hostile work environment claim is composed of a series of separate acts that collectively constitute *one* 'unlawful employment practice.' . . . A court's task is to determine whether the acts about which an employee complains are part of the *same* actionable hostile work environment practice" *Morgan*, 536 U.S. at 117, 120 (emphasis added). This

---

[10] Other circuits have discussed this distinction. *See Noviello v. City of Boston*, 398 F.3d 76, 87 (1st Cir. 2005) ("Even when retaliation is derivative of a particular act of harassment, it normally does not stem from the same animus. Most often, retaliation is a distinct and independent act of discrimination . . . ."); *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784 790–91 (2000) (excluding retaliatory conduct from a sexual harassment hostile work environment analysis because the plaintiff did not claim that the supervisor retaliated "because of sex" and thus, the retaliatory harassing conduct, "which was in no way sexual, is not actionable as sexual harassment under Title VII"); cf. Noviello, 398 F.3d at 87 (noting that when a *particular* individual "sexually harasses a victim and then engages in non-sexual retaliatory harassment, the sexual and non-sexual harassment arguably may be part and parcel of the same violation" because the non-sexual harassment is "'still charged with the same animus'" (internal citations omitted)).

suggests the possibility for *distinct* hostile work environment practices and the *Morgan* court noted that a single hostile work environment claim must be supported by incidents involving the "'same *type* of employment actions.'"  *Id.* at 120 (affirming circuit court's analysis on this point). In *Morgan*, all of those incidents were racially discriminatory.  *Id.*

While retaliation is necessarily linked to possible or actual prior discriminatory conduct, the Court finds that any retaliatory harassment in this case is not part of the same employment practice as that based on sexual harassment and the two should be considered separately.

###### D.        Required Exhaustion of Administrative Remedies

An employee who believes her employer discriminated or retaliated against her in violation of Title VII must seek administrative adjudication before suing in federal court.  *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010); *see* 42 U.S.C. § 2000e-16(c).  EEOC regulations require the employee to, "within 45 days of the date of the matter alleged to be discriminatory," contact an EEO counselor to try to informally resolve the matter.  29 C.F.R. § 1614.105(a)(1). After this initial EEO contact, the employee must file an administrative complaint with her agency within 180 or 300 days of the alleged unlawful employment practice.  *Id.* § 1614.106(a). The agency then conducts an investigation, and if requested by the employee, the matter is referred to an EEOC administrative judge for a hearing.  *Id.* §§ 1614.106(e)(2), 1614.108–09. After the agency investigation, or decision of the EEOC administrative judge, the employing agency must take "final action."  *Id.* § 1614.110.  At that point an aggrieved employee may appeal to the EEOC, or file suit in federal court pursuant to 42 U.S.C. § 2000e-16(c).  In cases where no "final action" is taken within 180 days after the filing of the charge with the EEOC, the Commission will notify the aggrieved federal employee, and the employee may file a lawsuit in

federal court within ninety days of that notice.  42 U.S.C. §§ 2000e-16(c), 2000e-5(1); *Murthy v. Vilsack*, 609 F.3d 460, 464 (D.C. Cir. 2010).

A discrete claim is time barred if it fell outside of the 45-day period prior to contact with an EEO counselor or the 180- or 300-day period prior to filing of the administrative charge. However, a hostile work environment claim will not be time barred if all of the acts composing the claim are part of the *same* unlawful employment practice, and at least one of these acts falls within the time period.  *Morgan*, 536 U.S. at 122.[11]

## III.   DISCUSSION

### A.      Title VII Hostile Work Environment Based on Sexual Harassment

As already mentioned, Title VII prohibits employers from discriminating against an individual based on gender with respect to the "compensation, terms, conditions, or privileges of employment."  42 U.S.C. § 2000e-2(a).  However, the Act bars not only discrete or tangible employment decisions, but also a "hostile or abusive work environment," for which economic or tangible impact need not be shown.  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). Thus, sexual harassment may form the basis of a hostile work environment claim and amount to unlawful discrimination.  *Id.*

To prove a hostile environment based on sexual harassment, the plaintiff must show:

(1) [she] was a member of a protected class; (2) [she] was subjected to unwelcome[ ] sexual harassment . . . ; (3) the harassment complained of was based upon sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating,

---

[11] *Morgan* dealt with the 180-day statutory deadline for filing an EEOC charge and not the 45-day regulatory requirement for contact with an EEO counselor.  536 U.S. at 104.  Nevertheless, courts have applied *Morgan* to the 45-day regulatory time limit.  *See, e.g., Greer v. Paulson*, 505 F.3d 1306, 1313 (D.C. Cir. 2007) (implicitly suggesting that the *Morgan* standard applies to the 45-day period); *Lyons v. England*, 307 F.3d 1092, 1106 n.6 (9th Cir. 2002) ("Although the circumstances in which [the 45-day limit] may be equitably tolled are no doubt broader than the tolling opportunities under [42 U.S.C. § 2000e–5(e)], . . . the mandatory nature of the federal regulation is sufficient to warrant full application of the *Morgan* rule.").

hostile, or offensive working environment . . . ; and (5) the existence of respondeat superior liability.

*Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1123 (D.C. Cir. 2002) (internal citation omitted)).[12]

The first three elements of this claim are generally easily satisfied when based on sexual harassment of a female employee by a male co-worker or supervisor. *See id.* ("[W]hen 'the challenged conduct . . . involves explicit or implicit proposals of sexual activity' between members of the opposite sex 'it is reasonable to assume those proposals would not have been made to someone of the same sex . . . .'" *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998)). However, sexually crude remarks, as opposed to advances, are not necessarily actionable if they were not made because of the plaintiff's sex.

It is more difficult for plaintiffs to demonstrate that harassment rose to the level of an actionable hostile environment. Plaintiffs must show harassing or retaliatory behavior that was "sufficiently *severe or pervasive* to *alter the conditions* of the victim's employment and create an abusive working environment." *Meritor*, 477 U.S. at 67 (emphasis added) (internal quotation marks omitted). The plaintiff need not show tangible or economic employment action, nor need she demonstrate "tangible psychological injury." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). However, the alleged conduct must be more than "merely offensive" *Id.* It must be severe or pervasive enough to "constructive[ly] alter[] . . . the terms or conditions of employment." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998). "'Mere utterance of an . . . epithet which engenders offensive feelings in [an] employee' does not sufficiently affect

---

[12] Although the existence of respondeat superior has been framed as part of the plaintiff's case, at least in the context of harassment by a supervisor it is an affirmative defense which must be raised initially in the employer's answer and for which the employer has the burden of proof. *See Jones v. Dist. of Columbia Dept. of Corr.*, 429 F.3d 276, 279 (D.C. Cir. 2005) (citing *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807). Thus, the plaintiff's burden to show respondeat superior liability is not high.

the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (quoting *Meritor*, 477 U.S. at 67).  The conduct must be both objectively hostile, and subjectively perceived by the victim as hostile or abusive and "unwelcome." *Id.* at 21–22; *Meritor*, 477 U.S. at 68.

To determine whether an environment is "hostile," courts look to "'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Morgan*, 536 U.S. at 116 (quoting *Harris*, 510 U.S. at 23).  In considering the totality of the circumstances, however, courts should be mindful that:

> Everyone can be characterized by sex . . . ; and many bosses are harsh, unjust and rude.  It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination.  Otherwise, the federal courts will become a court of personnel appeals.

*Bryant v. Brownlee,* 265 F. Supp. 2d. 52, 63 (D.D.C. 2003) (quoting *Alfano v. Costello,* 294 F.3d 365, 377 (2d Cir. 2002)).

Finally, plaintiffs must ultimately show that the employer is vicariously liable for the unlawful conduct.  *Faragher,* 524 U.S. at 807–08.  If the hostile work environment was created by a supervisor with immediate or successive authority over the employee, the employer may raise an affirmative defense to liability.  *Id.*  "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  When harassment is inflicted by non-supervisory co-workers, vicarious liability "depends on the plaintiff showing that the employer knew (or reasonably should have known)

about the harassment but failed to take appropriate remedial action." *Petrosino v. Bell Atl.*, 385 F.3d 210, 225 (2d Cir. 2004) (citing *Faragher*, 524 U.S. at 789).[13]

### 1.    *Bergbauer Timely Exhausted Her Claim of Harassment By Towner*

Navy asserts that Plaintiff did not contact its EEO office about the alleged harassment by Towner until more than a month after the 45-day deadline for initiating administrative remedies. Def.'s Mem. P. & A. 8. Bergbauer asserts that she timely exhausted because she reported the harassment to her supervisor on the same day as the last act of alleged harassment.

Navy has previously raised the same argument and the Court decided the issue in its September 2011 Memorandum Opinion. Although that Opinion responded to Navy's argument in a motion to dismiss context, the Court finds no reason to change its reasoning or decision. In its earlier Opinion, the Court stated:

> While the Secretary is correct that EEOC regulations require Title VII complainants to make EEO-counselor contact within 45 days of any allegedly discriminatory or retaliatory act, the purpose served by EEO contact is also served where a complainant brings such acts to the attention of a supervisor. *Lloyd v.*

---

[13] Courts generally apply the *McDonnell Douglas* burden-shifting framework to analyze traditional Title VII disparate treatment claims and retaliation claims. *See Taylor v. Solis*, 571 F.3d 1313, 1320 (D.C. Cir. 2009); *Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999) ("Claims of retaliation are governed by the *McDonnell Douglas* burden-shifting framework."). This framework requires that the plaintiff first establish a prima facie case of discrimination by a preponderance of the evidence; second the employer must present a legitimate, nondiscriminatory reason for its actions; and third, the plaintiff must establish that the employer's nondiscriminatory reason is a pretext to mask unlawful discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973); *see also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). The burden of persuasion is always with the plaintiff; only the burden of production shifts. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000). Although the D.C. Circuit appears to have, on occasion, endorsed application of the *McDonnell Douglas* framework to hostile work environment claims, *see Duren v. Wash. Metro. Area Transit Auth.*, 2004 WL 2857273, *1 (D.C. Cir. 2004) (per curiam); *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002)), Judge Urbina has pointed to authority suggesting that the framework does not apply to hostile work environment claims. *See Baloch v. Norton*, 355 F. Supp. 2d 246, 259 (D.D.C. 2005) (citing cases suggesting that, on a motion for summary judgment of a hostile work environment claim, courts simply assess the totality of the circumstances). This Court's review of cases in our circuit likewise suggests that the *McDonnell Douglas* framework does not apply to hostile work environment claims. *See, e.g.*, *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (applying *McDonnell Douglas* standard to substantive Title VII claim but totality of the circumstances standard to hostile work environment claim); *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 97 (D.D.C. 2007) (applying *McDonnell Douglas* framework to disparate treatment and retaliation claims but not to hostile work environment claim). Given the foregoing, this Court will not engage in a *McDonnell Douglas* type analysis but will instead evaluate whether Bergbauer has made out hostile work environment claims based on the totality of the circumstances.

*Chao*, 240 F. Supp. 2d 1, 3–4 (D.D.C. 2002).   Ms. Bergbauer brought Mr. Towner's inappropriate comments to the attention of her supervisor (Alan Weyman) on April 22, 2008, Am. Compl. [34-1] ¶¶27, 28, and so her complaint as to that alleged misconduct was timely.   Furthermore, under the Supreme Court's decision in *Morgan*, since that act was timely exhausted, the Secretary faces potential liability as to all other acts, even outside the filing period, so long as they constitute the same unlawful employment practice.   536 U.S. at 122.   Therefore, while the incident in San Diego in February 2008 took place well outside the 45-day limit for EEO counselor contact, so long as that event is part of the same unlawful employment practice as subsequent acts of sexual harassment, the Secretary may be liable.

Mem. Op. 11.

While Navy does not formally move for reconsideration, it accurately states that the Court may modify interlocutory orders "as justice requires."[14]  Def.'s Reply 5 (quoting *Ficken v. Golden*, 696 F. Supp. 2d 21, 34–35 (D.D.C. 2010)).   Factors the court may consider under the "as justice requires" standard include whether the court "has patently misunderstood a party, has made a decision outside the adversarial issues presented to the [c]ourt by the parties, has made an error not of reasoning, but of apprehension, or where a controlling or significant change in the law or facts [has occurred] since the submission of the issue to the court."  *Ficken*, 696 F. Supp. 2d at 34–35 (internal quotation marks and citation omitted).   "These considerations leave a great deal of room for the court's discretion and, accordingly, the 'as justice requires' standard amounts to determining 'whether [relief upon] reconsideration is necessary under the relevant circumstances.'"  *Id.* at 35.

Navy argues that *Lloyd v. Chao*, cited by the Court in its earlier Opinion, has been "clarified and distinguished" by the EEOC.   *See* Def.'s MSJ 10–11 (citing *Arnold v. Donahoe*, EEOC Request No. 0520110207 (June 23, 2011)).   However, this does not amount to a controlling or significant change in the law since submission of the issue to court.   The EEOC

---

[14] District courts may reconsider interlocutory decisions "at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties."  Fed. R. Civ. P. 54(b).  A party need not move for reconsideration.

decision occurred prior to the Court issuing its Memorandum Opinion.  Further, although courts give "great deference" to the EEOC in construing Title VII, *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 279 (1976), courts are not bound by EEOC decisions.

The Court finds no other reason to reconsider.  The 45-day Title VII time limit is not jurisdictional and courts can permit equitable tolling under extraordinary circumstances.  *See Killingsworth v. Potter*, 307 F. App'x 685, 688 (3d Cir. 2009) (not selected for publication) (citing examples such as where a plaintiff timely asserted her rights in the wrong forum). Moreover, reconsideration at this late stage, after Navy failed to move for reconsideration of the Court's earlier Opinion, would be inequitable in a case that is now over three years old.  Thus, the Court finds that plaintiff timely exhausted her claim to the extent it was based on actions by Towner.   In its earlier Opinion, the Court left open for consideration whether Towner's harassment was part of the "same unlawful employment practice" as Goddard's and thus whether a claim based on Goddard's conduct would be time barred.  The Court now considers this question.

### 2. *Goddard Incident Part of Same Unlawful Employment Practice as Towner Comments*

The Goddard incident occurred over 45 days prior to Bergbauer initiating contact with her supervisor.  Thus, it would be time-barred if not part of the "same unlawful employment practice" as at least one of the acts by Towner that fell within the 45-day period before April 22, 2008 (i.e. on or after about March 8, 2008).  *See Morgan*, 536 U.S. at 122.[15]

Bergbauer argues that the acts by Goddard and Towner were part of the same unlawful practice, essentially because the alleged incidents were all of a sexual or romantic nature, Goddard and Towner worked in the same division of NAVSEA, and Goddard and Towner acted

---

[15] Two interactions between Towner and Bergbauer occurred beyond the 45-day time period but Navy does not dispute that these would be part of the same employment practice.

in concert and were aware of one another's conduct.  Pl.'s Mem. P. & A. at 36.  The Court will

not consider this last allegation further because Bergbauer provides no support for it.[16]

Navy responds that the "mere fact that Towner and Goddard worked in the same office

and both allegedly engaged in sexually harassing behavior does not, without more, demonstrate a

discriminatory policy or practice such that their alleged acts should be viewed as sufficiently

related for purposes of administrative exhaustion."  Def.'s Mem. P. & A. 14.  Navy suggests that

Goddard's acts occurred during a discrete period of time, during a social outing away from the

workplace, and were never repeated.  *Id.* at 15–16.  In contrast, Towner's remarks occurred in

the workplace over approximately five months.  *Id.* at 16.  Navy asserts that there is no evidence

that Goddard and Towner acted in concert or that either knew of the other's behavior.  *Id.*  Navy

also points to Bergbauer's failure to pursue corrective action against Goddard when the Navy

began to investigate the comments by Towner.  *Id.*

There is little caselaw in our circuit to elucidate what constitutes the "same unlawful

employment practice."  In *Morgan*, the Supreme Court affirmed the Ninth Circuit's finding that

incidents constituted the same actionable hostile environment claim because they involved "'the

same type of employment actions, occurred relatively frequently, and were perpetrated by the

same managers.'"  *Morgan*, 536 U.S. at 120 (quoting *Morgan v. Nat'l R.R. Passenger Corp.*, 232

F.3d 1008, 1017 (9th Cir. 2000)); *see also Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir.

2011) (citing the same factors); *id.* ("'[A]cts before and after the limitations period [that are] *so*

*similar in nature, frequency, and severity* . . . must be considered to be part and parcel of the

---

[16] She bases her assertion on Towner's statement that he was going to bring a "special kind of liquor" to a tailgate for her, which she interpreted to be a reference to the tequila she drank with Goddard in San Diego.  However, Towner stated that he was referring to White Russians because he had seen Bergbauer drinking them at an office Christmas Party.  Pl.'s Opp'n, Ex. O, encl. 16.  Thus, there is insufficient evidence, even making all "justifiable inferences" in favor of plaintiff, to infer that Towner and Goddard knew of one another's conduct, much less that they acted in concert.

hostile work environment . . . .'" (quoting *Wilkie v. Dep't of Health & Human Servs.*, 638 F.3d 944, 951 (8th Cir. 2011)).

The D.C. Circuit recently acknowledged that many of the formulations for determining whether incidents constitute the same actionable hostile environment claim "are at best only rather general, but neither the Supreme Court nor any circuit seems yet to have offered anything more illuminating." *Baird*, 662 F.3d at 1251. However, the Circuit has addressed, in at least one case, whether events were part of the "same unlawful employment practice." In *Vickers v. Powell*, the Circuit reviewed a district court decision which had held, on summary judgment, that alleged incidents involving coarse behavior and sexual and sexist comments by one supervisor were *not* part of the same actionable hostile work environment created by a subsequent supervisor which involved the exchange of harsh words "'in the context of [the supervisor's] exercise of normal supervisory functions . . . such as administering performance appraisals, inquiring into an employee's use of sick leave, and inquiring into time management of his subordinates.'" 493 F.3d 186, 198–99 (D.C. Cir. 2007) (quoting *Vickers v. Powell*, No. 03-174, 2005 WL 3207775, at *33 (D.D.C. Nov. 21, 2005)). The Circuit held that the district court had erred and that

> [The] allegations were [not] so different in kind that, as a matter of law, we can conclude that they were not part of the same hostile work environment. The line between [one supervisor] creating a hostile environment through sexual conduct and his deputy-turned successor . . . perpetuating the environment by condoning the same is not so well-defined to say that the [supervisors'] acts have 'no relation' as required in *Morgan*.

*Id.* at 199. The Circuit held this despite the fact that the conduct was perpetrated by different supervisors, was of different types (sexual and non-sexual), and occurred over a span of eight years prior to the timely reported events.

Were it not for the D.C. Circuit's decision in *Vickers*, this Court would conclude that the Goddard incident was not part of the same unlawful practice as Towner's comments. While the events were sexual in nature or may have had romantic undertones, the acts were perpetrated by different individuals at different levels of the organization—one a supervisor, the other a co-worker. Moreover, the incidents took place in entirely different settings—one at a social gathering during an out-of-town work trip and the other at work during business hours. The Goddard incident took place once and was never repeated whereas the comments by Towner occurred several times over an approximately five month period.

In light of *Vickers*, however, the Court cannot, as a matter of law, conclude that they are not part of the same unlawful employment practice. Thus, the Court cannot conclude that the Goddard incident is time-barred. However, as explained below, even with the inclusion of the Goddard incident, Bergbauer has not shown that the alleged harassment is actionable.

### 3. *Plaintiff Has Not Shown Severe or Pervasive Sexual Harassment Sufficient to Create Hostile Work Environment*

Although Navy argues for summary judgment on the basis of Bergbauer's supposed failure to exhaust, it fails to address whether the alleged conduct rises to the level of a hostile work environment. Nevertheless, the Court holds that, as a matter of law, the plaintiff has not demonstrated severe or pervasive conduct sufficient to constitute a hostile work environment. *See* Fed. R. Civ. P. 56(f) ("After giving notice and a reasonable time to respond, the court may . . . grant [a summary judgment] motion on grounds not raised by a party.").[17]

Again, to be actionable under a hostile work environment theory, harassment must so be severe or pervasive as to "constructive[ly] alter[] . . . the terms or conditions of employment."

---

[17] Although the Court has not given notice of its intention to grant summary judgment on this ground, there is no prejudice to Bergbauer because this is a key element of her case and she is aware that she must show harassment sufficiently severe or pervasive as to affect her employment.

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998).  The analysis involves consideration of the totality of the circumstances, *see Oncale*, 523 U.S. at 81, and the assessment of the severity of the alleged harassment should include "careful consideration of the social context in which particular behavior occurs and is experienced by its target," *id.* at 81.

Although the standard for a hostile work environment requires that conduct be severe *or* pervasive, courts generally find actionable claims only where the conduct is both quite severe and pervasive.[18]  Isolated incidents, if extraordinarily severe, may be sufficient to constitute actionable harassment.  However, the cases supporting this view are not uniform or from our circuit.[19]  In our circuit, even multiple instances of physical contact and sexual advances may not be sufficient to meet the demanding legal standard for a hostile work environment.[20]

---

[18] *See Faragher*, 524 U.S. at 782 (finding actionable hostile environment where, over five-year period, supervisors repeatedly touched and sexually propositioned female lifeguards, made lewd remarks and gestures, spoke of women in offensive terms); *Meritor*, 477 U.S. at 60 (finding hostile work environment where supervisor insisted plaintiff have sex with him during and after work, followed her into the restroom, fondled her in front of other employees, and raped her); *Gary v. Long*, 59 F.3d 1391, 1397 (D.C. Cir. 1995) ("[Supervisor]'s repeated verbal and physical harassment of [plaintiff], culminating in a rape, is 'not only pervasive harassment but also criminal conduct of the most serious nature' that is 'plainly sufficient to state a claim for hostile environment sexual harassment.'" (quoting *Meritor*, 477 U.S. at 67)); *Simms v. Ctr. for Corr. Health & Policy Studies*, 794 F. Supp. 2d 173, 193 (D.D.C. 2011) (reasonable jury could find hostile work environment where co-worker asked out plaintiff every time he saw her, harassed her daily for two years by commenting on her appearance, asking to see her body, staring at her, and undressing her with his eyes, and physically accosted her at work); *Johnson v. Shinseki*, 811 F. Supp. 2d 336, 346 (D.D.C. 2011) (jury could find hostile work environment where co-worker made inappropriate comments, behavior intensified over time, and co-worker "began a course of physical intimidation and contact with [plaintiff] that included attempts to kiss her, uninvited visits to her office, solicitations for sex, grabbing and pinching of her breast, and grabbing and spanking of her behind").

[19] *Compare, e.g.*, *Quantock v. Shared Mktg. Servs.*, 312 F.3d 899, 904 (7th Cir. 2002) (during one encounter, company president requested sex three times from plaintiff with whom he worked in close quarters, thus reasonable jury could find conduct sufficiently severe), *Worth v. Tyer*, 276 F.3d 249 (7th Cir. 2001) (harassment spanning just two days was sufficiently severe to support a claim where supervisor made inappropriate comments, touched plaintiff on her head, neck, and shoulders, and reached into her dress to touch her breast), *Moring v. Arkansas Dep't of Corr.*, 243 F.3d 452 (8th Cir. 2001) (supervisor made indirect threats about plaintiff's safety, came to her hotel room late at night during overnight business trip and refused to leave, placed his hand on her thigh and tried to kiss her), *with McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996) (three sexually suggestive comments by a co-worker did not unreasonably interfere with plaintiff's work environment), *Brooks v. City of San Mateo*, 229 F.3d 917, 927 (9th Cir. 2000) (finding no hostile work environment where co-worker once touched plaintiff's stomach, commented on its sexiness, and forced his hand below her sweater and bra to fondle her breast).

[20] *See Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 97–99 (D.D.C. 2007) (acts of sexual harassment by supervisor, including touching plaintiff's buttocks and thigh, trying to kiss her, calling her beautiful, and asking her to accompany him on weekend trip, "although by no means ideal workplace conduct, [were] not 'sufficiently severe or pervasive to alter the conditions of [Akonji's] employment and create an abusive working environment.'"

Furthermore, incidents involving only verbal comments, particularly by co-workers, must generally be quite pervasive and severe to be actionable.[21]  Finally, although not explicitly part of the analysis, some courts consider remedial action taken by the employer in determining whether a hostile work environment existed.[22]

Bergbauer's claim simply does not meet the demanding standard for a hostile work environment claim; the conduct is not sufficiently "severe or pervasive" to alter the conditions of her employment.  The allegations against Towner amount to unspecified compliments about her looks, comments that could be seen as romantically or sexually suggestive, and a crass, sexually explicit joke.[23]  The allegations against Goddard, while much more serious, involve an isolated incident, outside of the workplace, that was never repeated.  Although Bergbauer may have subjectively perceived the environment to be abusive, she has not shown that it was objectively abusive or hostile.  The conduct appears less severe and less pervasive than the conduct alleged in cases where courts have granted summary judgment for the defendant employer.  *See supra*

(quoting *Harris*, 510 U.S. at 21)); *Carter v. Greenspan*, 304 F. Supp. 2d 13, 25 (D.D.C. 2004) ("Assuming that plaintiff's allegations that [co-worker] 'caressed [him] on his knee,' 'placed her breast on [his] arm,' and 'placed her fingers on [his] buttocks' are true . . . these three isolated incidents are not sufficiently severe in quantity or quality to unreasonably interfere with plaintiff's work performance or create a hostile work environment.").

[21] *See Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268 (2001) (no actionable harassment where male co-worker and supervisor chuckled about comment a third party had made to a colleague that "I hear making love to you is like making love to the Grand Canyon"); *Webb-Edwards v. Orange Cnty. Sheriff's Office*, 525 F.3d 1013, 1027 (11th Cir. 2008) (holding that comments by supervisor that plaintiff was hot and needed to wear tighter clothes, made weekly over 8-week period, were not severe or pervasive); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (no actionable harassment where supervisor made nine suggestive comments, called plaintiff "pretty girl," and grunted when she wore a leather skirt).

[22] *See Brooks v. City of San Mateo*, 229 F.3d 917, 924 (9th Cir. 2000) ("[I]f the employer takes appropriate corrective action, it will not have ratified the conduct. In such circumstances, it becomes difficult to say that a reasonable victim would feel that the terms and conditions of her employment have changed as a result of the misconduct."); *Webb-Edwards v. Orange Cnty. Sheriff's Office*, 525 F.3d 1013, 1028 (11th Cir. 2008) (noting just prior to affirming summary judgment for defendant employer that employer took immediate action to redress plaintiff's grievances).

[23] Making all justifiable inferences in favor of Bergbauer, the Court will assume that all of Towner's comments were directed at Bergbauer because of her sex.  However, this is not self-evident.  For example, Towner encouraged Bergbauer to attend a tailgate and said he had "special liquor" for them.  This could be a romantic overture but could just as easily be interpreted as a friendly effort to encourage a coworker to attend a work-related event.  Moreover, although Towner told a crass and extremely inappropriate joke, the sexual nature of the joke does not automatically suggest that it was directed at Bergbauer because of her sex.

n.18.  The conduct involved only one incident of physical touching and that incident, as already stated, took place outside of the workplace, outside of work hours, in a social situation in which all present were drinking heavily.  Towner's conduct involved only a handful of verbal comments made by a non-supervisory co-worker and these were less severe and pervasive than the comments made even in cases where summary judgment has been entered for the employer. *Compare Simms*, *supra* n.18; *Shinseki*, *supra* n. 18, *with* McKenzie, *supra* n.19; *Breeden*, *supra* n.21; *Baskerville*, *supra* n.21.

Finally, of relevance to whether the workplace could reasonably continue to be perceived as hostile, Navy promptly took corrective action once plaintiff reported the conduct of Towner to her supervisor.  Moreover, the Naval Inspector General proactively contacted Bergbauer in response to an anonymous third-party complaint about Goddard's conduct and Navy quickly relieved him of his position.

### B.    Retaliatory Hostile Work Environment

#### 1.    *Legal Standard*

Again, separate Title VII provisions bar discrimination based on protected status and that based on protected activity.  *See* 42 U.S.C. § 2000e-2(a) (antidiscrimination provision); *id.* § 2000e-3(a) (antiretaliation provision).  As with discrimination based on protected class, a hostile work environment may constitute retaliation under Title VII and most federal circuits now recognize a retaliatory hostile work environment claim.  *Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012).  There is some debate as to whether the Supreme Court has formally recognized such a claim but the Court has not foreclosed it either.  *See Stewart v. Indep. School Dist. No. 196*, 481 F.3d 1034, 1042 (8th Cir. 2007) (interpreting the Supreme Court's decision in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 60 (2006) to "expressly" recognize and define retaliatory hostile work environment claims).

Logically, the elements of a retaliatory hostile work environment claim are similar to those of a discriminatory hostile work environment claim.  A plaintiff must show that she engaged in activity protected by Title VII; she suffered actionable retaliatory harassment; the defendant knew of plaintiff's protected activity and there was a causal connection between the harassment and that activity; and the existence of respondeat superior liability.  *See Morris*, 201 F.3d at 792 (outlining standard for retaliatory hostile work environment).

    a.    Legal standard for actionable retaliatory harassment after *Burlington Northern*

Courts in our circuit typically apply the same legal standard as that used in the discriminatory harassment context to determine whether retaliatory harassment is actionable. Specifically, plaintiffs must show retaliatory harassment that is "sufficiently severe or pervasive *to alter the conditions of the victim's employment*."  *Baird v. Gotbaum*, 662 F.3d 1246, 1250 (D.C. Cir. 2011) (emphasis added); *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006) (noting that plaintiff must show "intimidation, ridicule, and insult of such severity or pervasiveness *as to alter the conditions of [her] employment* and create an abusive environment" (emphasis added) (internal quotation marks omitted)); *Bonnette v. Shinseki*, No. 10-2110, 2012 WL 5986466, at *20 n.11 (D.D.C. Nov. 30, 2012) ("[T]he legal standard is the same for either [discriminatory or retaliatory harassment]." (citing *Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008)).

The Court will apply this standard to Bergbauer's claim.  However, it is unclear whether applying the same standard to discriminatory and retaliatory hostile work environment claims remains appropriate after *Burlington Northern*.  Because our Circuit does not appear to have addressed this question, the Court outlines its view of the matter in some detail below.

In *Burlington Northern*, the Court made clear that the standards for retaliation and discrimination are not "coterminous" and that the protections provided for victims of retaliation may be broader than those for victims of discrimination. *Burlington N.*, 548 U.S. at 60. In traditional discrimination cases, plaintiffs must show that they suffered an "adverse employment action" which amounted to a change in "compensation, terms, conditions, or privileges of employment." *See Brady v. Office of Sergeant of Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008); 42 U.S.C. § 2000e-2(a). However, *Burlington Northern* made clear that Title VII's antiretaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment. . . . [The provisions] are not coterminous. The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." 548 U.S. at 64–67 (emphasis added). The Court went on to hold that, to succeed on a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action *materially adverse*, 'which in this context means it *well might have dissuaded* a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 68 (emphasis added) (internal citations omitted). As an example, the Court suggested that exclusion of an employee from "a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining" and thus might be actionable. *Id.* at 69.

In reaching its conclusion, the Court focused on differences in the language and purposes of the antiretaliation and antidiscrimination provisions. With respect to the antidiscrimination provision, the Court stated that the words "'hire,' 'discharge,' 'compensation, terms, conditions, or privileges of employment,' . . . explicitly limit the scope of that provision to actions *that affect employment or alter conditions of the workplace*. No such limiting words appear in the

antiretaliation provision." *Burlington N.*, 548 U.S. at 62 (emphasis added).  Moreover, the purposes of the two provisions differ.  The antidiscrimination provision furthers Title VII's primary objective of preventing discrimination based on status; the "antiretaliation provision seeks to secure that primary objective" by preventing employers from interfering with employees' efforts to enforce the act.  *Id.* at 63.  "[O]ne cannot secure the second objective by focusing only upon employer actions and harm that concern employment and the workplace." *Id.*  The Court thus rejected the contention that it is "'anomalous' to read the statute to provide broader protection for victims of retaliation than for those whom Title VII primarily seeks to protect . . . .  Interpreting the antiretaliation provision to provide broad protection from retaliation helps ensure the cooperation upon which accomplishment of the Act's primary objective depends." *Id.* at 67.

The Supreme Court's reading calls into question how courts have since analyzed retaliatory hostile work environment claims.  The hostile work environment standard was initially developed and applied, prior to *Burlington Northern*, in the context of *substantive* discrimination.[24]  *See Meritor*, 477 U.S. at 65–66 (noting that *Rogers v. EEOC*, 454 F.2d 234 (5th Cir. 1971), a case alleging national origin discrimination, was apparently the first case to recognize a hostile work environment cause of action and that other courts had applied the theory to harassment based on race, religion, and national origin).  Courts thus framed the claim in terms of the language of § 2000e-2 and the need for harassment to be sufficiently severe as to affect the "terms, conditions, or privileges of employment."  Thus, in *Meritor*, the Supreme Court stated "*the language of Title VII* is not limited to 'economic' or 'tangible' discrimination.

---

[24] *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–66 (1986) (noting that *Rogers v. EEOC*, 454 F.2d 234 (5th Cir. 1971), a case alleging discrimination based on national origin, was apparently the first case to recognize a hostile work environment cause of action and that other courts had applied the cause of action to harassment based on race, religion, and national origin).

The phrase '*terms, conditions, or privileges of employment*' evinces a congressional intent 'to

strike at the entire spectrum of disparate treatment of men and women' in employment."   477

U.S. at 64 (emphasis added).  The court went on to note

> [N]ot all workplace conduct that may be described as "harassment" affects a
> "*term, condition, or privilege*" of employment within the meaning of Title VII. . .
> .  For sexual harassment to be actionable, it must be sufficiently severe or
> pervasive "*to alter the conditions of [the victim's] employment* and create an
> abusive working environment."

*Id.* at 67 (1986) (emphasis added) (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th

Cir. 1982)).

Other cases have likewise emphasized the linkage between the language of § 2000e-2 and

the hostile work environment standard.  *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S.

75, 80 (1998) ("The prohibition of harassment on the basis of sex . . . forbids only behavior so

objectively offensive as to alter the '*conditions' of the victim's employment*.'" (emphasis

added)); *id.* ("'The critical issue, *Title VII's text indicates*, is whether members of one sex are

exposed to disadvantageous *terms or conditions of employment* . . . .'" (emphasis added));

*Faragher*, 524 U.S. at 788 ("'[S]imple teasing,' offhand comments, and isolated incidents

(unless extremely serious) will not amount to discriminatory *changes* in the '*terms and

conditions of employment*.'" (emphasis added)).

By the time the Supreme Court decided *Burlington Northern* in 2006, the majority of

federal circuits had recognized that "a hostile work environment can amount to retaliation."

*Hussain*, 435 F.3d at 366; s*ee Gowski*, 682 F.3d at 1311 (listing eight circuits, including our own,

as recognizing a retaliatory hostile work environment claim prior to *Burlington Northern*).

Those circuits appear to have applied the same substantive hostile work environment standard

("sufficiently severe or pervasive 'to alter the conditions of the victim's employment'") to

retaliatory hostile work environments as well.

Since 2006, at least three Circuits have applied a standard more consistent with *Burlington Northern* in retaliatory hostile work environment cases.  The Eighth Circuit read *Burlington* itself as "expressly [holding] that retaliation claims under Title VII could be based on a hostile work environment" and as "establish[ing] a standard to define the concept of a hostile work environment for the purpose of retaliation claims under Title VII."  *Stewart v. Indep. School Dist. No. 196*, 481 F.3d 1034, 1042 (8th Cir. 2007).  The First and Third circuits recently applied a retaliatory hostile work environment standard which requires that retaliatory harassment be "'materially adverse'" such that it "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Alvarado v. Donahoe*, 687 F.3d 453, 461 (1st Cir. 2012) (quoting *Burlington Northern* and applying the standard in a Rehabilitation Act case); *Moore v. City of Philadelphia*, 461 F.3d 331, 341, 346 (3d Cir. 2006) (similar).[25]

Courts in our Circuit do not appear to have reconsidered the retaliatory harassment standard in light of *Burlington Northern*.  A good argument can be made that courts should now do so.  Rather than asking whether retaliatory harassment was so severe or pervasive as to alter the terms and conditions of employment, courts would ask whether the harassment would deter a reasonable employee from engaging in protected activity.

Nevertheless, at least three contrary arguments convince this Court that it must apply the more stringent standard to the case at hand.  First, the D.C. Circuit describes retaliatory hostile work environment claims in terms of the discrimination standard and this is the consistent practice among district judges in our circuit.  The Court cannot ignore this precedent.

---

[25] The Tenth Circuit may likewise apply the more lenient material adversity standard to retaliatory hostile work claims, though this is unclear.  *See Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1268–69 (10th Cir. 2013) (noting, in a § 1981 retaliation case arguing retaliation based on discrete acts *and* hostile work environment, that "some of the alleged retaliatory actions would not support a retaliation claim because they were not severe enough to deter a reasonable person from claiming discrimination").

Second, the Court does not read *Burlington Northern* to *require* a more lenient hostile work environment theory.  Although the Supreme Court's reasoning and reading of the Title VII statute logically suggest that its holding should extend to hostile work environment claims, the holding was actually applied in the context of two discrete retaliation claims.  The Court went on to analyze each claim separately and did not apply a hostile work environment theory.  Thus, it does not appear that *Burlington* requires that the Court disregard binding D.C. Circuit precedent.

Finally, aligning the retaliatory hostile work environment with the broader retaliation standard could result in consequences not intended by Congress or the courts.  Apart from the difference in legal standards, a hostile work environment claim differs from a discrete retaliation claim in at least two important ways.  First, the hostile environment claim allows a plaintiff to aggregate otherwise minor and lawful conduct into a single actionable claim.  Second, the hostile environment exhaustion requirement is more permissive than that for discrete retaliation.  A claim is timely as long as just one of the alleged acts comprising the hostile work environment falls within the statutory time period and the acts are part of the same unlawful employment practice.  *Morgan*, 536 U.S. at 122.  This allows plaintiffs to combine acts committed over a period of many years, including acts by different supervisors, into a single actionable claim.  *See Vickers v. Powell*, 493 F.3d 186, 199 (D.C. Cir. 2007) (holding that conduct of different types, perpetrated by different supervisors, and occurring over a span of at least eight years might meet the exhaustion requirement).

In short, although the Court believes that *Burlington Northern* logically suggests that courts apply a different standard to retaliatory hostile work environment claims, the Court will continue to apply the standard articulated by the D.C. Circuit.  The Court declines to speculate whether it would reach a different conclusion on Bergbauer's claim under a standard aligned

with *Burlington Northern*.  Thus, to succeed on her claim today, Bergbauer must show that she suffered retaliatory harassment that was "sufficiently severe or pervasive *to alter the conditions of [her] employment*."  *Baird*, 662 F.3d at 1250 (emphasis added).

                    b.      Demonstrating causal connection

Whereas it can often be inferred that sexual harassment was "based on" the victim's sex, it is harder to show that harassment was in retaliation for a victim's protected activity.

In the context of discrete retaliation cases, a plaintiff may satisfy her prima facie burden to show a causal connection by showing that "the employer had knowledge of the employee's protected activity, and . . . the adverse personnel action took place shortly after that activity." *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985).  The temporal proximity used to support an inference of causation must be "very close," i.e., less than three to four months.  *Breeden*, 532 U.S. at 273 ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" (internal citations omitted)).

Courts appear to have applied the "knowledge plus temporal proximity" standard to hostile work environment claims as well.  *See Na'im v. Clinton*, 626 F. Supp. 2d 63, 81 (D.D.C. 2009) (rejecting retaliatory hostile work environment claim for failure to demonstrate temporal proximity or provide direct evidence); *Nichols v. Truscott*, 424 F. Supp. 2d 124, 141 (D.D.C. 2006) ("A plaintiff may demonstrate such a causal connection [between harassment and protected activity] by showing that her employer had knowledge of her protected activity and that the adverse action took place shortly thereafter.").

However, the causation determination in the hostile work environment context is somewhat more complex than that for discrete retaliation claims. Logically, only the actions that have a causal link to protected activity may be considered part of a hostile work environment claim. *See Noviello*, 398 F.3d at 93 ("It is only those actions, directed at a complainant, that stem from a retaliatory animus which may be factored into the hostile work environment calculus."); *Alvarado*, 687 F.3d at 459; *Alfano*, 294 F.3d at 377 ("It is . . . important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals."). Thus, some courts exclude from a hostile work environment claim acts committed by individuals who were unaware of the plaintiff's protected activity or acts for which a causal connection cannot be shown. *See Alvarado*, 687 F.3d at 459 ("[T]here must be 'competent evidence that the alleged retaliators *knew* of the plaintiff's protected activity and that a retaliatory motive played a part . . . .'" (internal citations omitted)). "[I]f a supervisor or other employee is unaware of the fact that a plaintiff engaged in protected conduct, any actions attributable to him could not plausibly have been induced by retaliatory motives." *Id.*

Although the D.C. Circuit has suggested that "close temporal relationship *may alone* establish the required causal connection," *Singletary*, 351 F.3d at 525 (emphasis added), this and similar holdings appear to have been in the context of making out a prima facie case for pure retaliation claims. *See Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) ("*For purposes of establishing a prima facie case of retaliation*, '[t]emporal proximity can indeed support an inference of causation, but only where the two events are very close in time.'" (emphasis added) (internal citations omitted)); *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985) ("The causal connection component *of the prima facie case* may be established by

showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity.").

The Court assumes, as other courts have done, that a close temporal relationship may support an inference of causation in a hostile work environment claim and may assist courts in determining which actions are part of the alleged hostile work environment.  However, in some instances, temporal proximity alone may not sufficiently show causation for purposes of summary judgment or trial.  Hostile work environment cases do not typically apply the *McDonnell-Douglas* burden shifting framework.  Instead, the question is whether the plaintiff, based on a totality of the circumstances, has demonstrated causation sufficient to survive summary judgment or to succeed at trial.  In contrast, the question at the prima facie stage of a pure retaliation claim is whether the plaintiff has demonstrated causation sufficient to merely make out a prima facie showing, to which the defendant will have a chance to respond.  *See Hamilton*, 666 F.3d at 1359 ("Considering the 'minimal burden' imposed at the prima facie stage, we find the evidence sufficient to establish a prima facie case of retaliation.").  Once a prima facie showing is made and a proferred non-discriminatory explanation offered, "positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine."  *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007).  Moreover, it is for the district court to determine whether temporal proximity is enough, in the context of other evidence, to support a finding of causation.  *Singletary*, 351 F.3d at 525 (remanding for the district court to determine whether close temporal relationship, "in the context of other evidence, . . . persuades the court that the defendants unlawfully retaliated against the plaintiff").

### 2.   *Bergbauer Cannot Succeed on Her Retaliatory Hostile Work Environment Claim*

Navy argues that, "[e]ven assuming that all of the alleged acts were motivated by retaliation, the totality of the incidents . . . does not establish a pattern of 'severe' or 'pervasive' conduct that altered the conditions of [Bergbauer's] working environment."  Def.'s Mem. P. & A. 18.  It further asserts that Bergbauer has not put forth evidence, other than her own testimony, to show a nexus between her protected activity and any allegedly retaliatory action.  The Court agrees with Navy.

> a.   Alleged Retaliatory Conduct that May Not be Included in the Hostile Work Environment Claim

For various reasons, the Court will not consider as part of the analysis of Bergbauer's hostile work environment claim, any loss in pay based on poor performance reviews or the removal of certain job duties from Bergbauer's purview.[26]  First, these allegations really concern allegedly concrete or tangible employment actions that are not appropriately brought as part of a hostile work environment claim.  The essence of a hostile work environment claim is that a serious of acts, which might not individually alter the terms or conditions of employment, has collectively altered such terms.  The claim is typically used for harassment, not for actions with a tangible impact on pay or duties.  For example, in the context of sexual harassment claims, the Supreme Court has noted the distinction:

> When a plaintiff proves that a *tangible employment action* resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that *the employment decision itself* constitutes a change in the terms and conditions of employment that is actionable under Title VII.  For any sexual *harassment preceding the employment decision* to be actionable, however, the conduct must be severe or pervasive.

---

[26] It is unclear if Bergbauer considers her shift to a GS-14, rather than a GS-15, pay level to be a retaliatory act.  As the Court reads the record, this shift was the result of the transition of Naval civilian employees to the General Schedule pay system.  Bergbauer's salary remained the same when this shift occurred, Def.'s MSJ, Ex. 1, at 3, and it is possible that her assignment to GS-14 was in fact *based on* the amount of her salary at the time.  In any case, Bergbauer has not provided any evidence, beyond speculation by herself and Sam Samimi, to suggest that this action either reduced her pay or was retaliatory.

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753–54 (1998) (emphasis added); *cf. Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) ("Disparate treatment can take the form *either* of a 'tangible employment action,' such as a firing or demotion, or of a 'hostile work environment' that changes 'the terms and conditions of employment, even though the employee is not discharged, demoted, or reassigned.' (emphasis added)); *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 776–77 (5th Cir. 2009) ("[T]he threshold question is whether the employee suffered a tangible employment action, and based on the answer, the claim is classified as *either* a hostile work environment or a quid pro quo claim. (emphasis added)).

It is true that tangible employment actions may inform whether an employer should be held vicariously liable for a hostile work environment. However, this is because employers are strictly liable for harassment *culminating in* a tangible employment action. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 808 (1998). This is a different aspect of the hostile work environment analysis that is relevant only if the plaintiff successfully shows harassing conduct that was sufficiently severe or pervasive as to alter the terms or conditions of her employment.

Moreover, the allegations above are the sorts of discrete retaliatory acts that courts in our Circuit frown on including in a broader hostile work environment claim. *Baloch v. Norton*, 517 F. Supp. 2d 345, 364 (D.D.C. 2007). If Bergbauer wishes to challenge these actions directly, she should bring distinct retaliation claims, assuming she can show that they have been exhausted.[27]

---

[27] The Court is aware of the D.C. Circuit's statement that it "find[s] no authority for the idea that particular acts cannot as a matter of law simultaneously support different types of Title VII claims . . . ," *Baird*, 662 F.3d at 1252, and that courts may not "dismiss a hostile work environment claim *merely* because it contains discrete acts that the plaintiff claims (correctly or incorrectly) are actionable on their own." *Id.* The Court agrees that a hostile work environment claim is necessarily comprised of discrete acts which together comprise a single unlawful practice. However, the practical impact of allowing tangible employment actions, which have not been exhausted, to be included in a hostile work environment claim would be to allow employees to circumvent Title VII's exhaustion requirements and, assuming that the single tangible event is actionable, to allow any remotely related, but minor, actions by the employer to also be actionable. The discrete acts at issue in *Baird* do not appear to have included tangible employment actions and so the Circuit did not need to consider that question. *See Baird v. Snowbarger*, 744 F. Supp. 2d 279, 294 (D.D.C. 2010) *aff'd in part, vacated in part sub nom. Baird v. Gotbaum*, 662 F.3d 1246

Even if the Court were to include these allegations in Bergbauer's hostile work environment claim, she has failed to sufficiently show a causal connection with respect to these incidents.  Again, causation may be inferred based on a showing that the employer knew of the employee's protected activity and the alleged retaliation occurred within three months or less of the activity.  Before July 3, 2008, at most only a small group of people, including RDML McManamon knew that Bergbauer had complained about Goddard's conduct.  Def.'s SMF ¶ 20; Pl's SMF ¶ 20.  There is no evidence in the record that Deskins knew of Bergbauer's complaint prior to early- to mid-July; making all reasonable inferences in favor of Bergbauer, Deskins appears to have learned of her complaint around July 3 or in the weeks following.  *See* Pl.'s Opp'n, Ex. R, at 38, 56 (stating that Goddard did not mention Bergbauer's name to him and that Deskins did not speak with her about the situation until weeks after Goddard announced that she had "gone after him").  Bergbauer has presented no evidence that Deskins knew she made a formal complaint on September 15, 2008 or that she filed suit in June 2009.  Bergbauer has also provided no evidence that her subsequent supervisor, Craig McKay, or "senior leadership" above him were aware of any of her original protected activity, much less any protected activity in which she engaged around the time of her second performance review in January 2010.

Thus, the combination of knowledge and temporal proximity do not support a causal connection between Bergbauer's protected activity and any of the actions listed above.  Deskins' "unwarranted" performance review of Bergbauer was given in January 2009, four months after the filing of her formal charge.  Thus, even if he knew of that charge, the temporal delay defeats a causal inference.  Bergbauer received her next "poor" performance review based on a decision

---

(D.C. Cir. 2011) (describing a hostile work environment claim based on "inflammatory, defamatory, libelous, and intimidating emails," "unfounded, harmful allegations about Plaintiff," as well as verbal assault, physical intimidation, and harassment).  Finally, the Court here does not dismiss the plaintiff's claim merely because it includes discrete acts, rather the Court simply excludes from the analysis of the hostile work environment claim these discrete acts and provides additional reasons for doing so.

by "senior leadership" in January 2010, at least six months after she filed this suit. Again, it is not clear that leadership knew of her activity and there is a large temporal gap. [28] Finally, Bergbauer lost responsibility over IT and security in early 2011, long after any of her protected activity.

Bergbauer has also failed to present sufficient additional evidence to show that these events were causally related to her protected activity. With respect to the removal of duties over IT and security, the record suggests that this decision was made solely by Craig McKay in early 2011. Pl.'s Opp'n, Ex. M, at 25–26. [29] Although Sam Samimi speculated that these responsibilities were removed from Bergbauer's purview because of her protected activity, he provides no factual basis for this assertion. Pl.'s Opp'n, Ex. N, at 51. Moreover, McKay stated that the basis for his decision was the growth and complexity of the organization. *Id.* There is also no indication in the record that McKay knew of Bergbauer's protected activity. Finally, McKay had previously recommended a high performance rating for Bergbauer, thus further undercutting any indication of retaliatory intent on his part.

With respect to the performance review by Deskins, Bergbauer now asserts that her "poor" rating was retaliatory. However, she explicitly disclaimed any retaliatory intent when she administratively appealed that rating. *See* Pl.'s Opp'n, Ex. E, at 8 ("I am not alleging that prohibited discrimination or reprisal occurred in relation to the challenged rating of record or job

---

[28] Assuming the individuals comprising "senior leadership" knew of Bergbauer's protected activity, perhaps a court could find temporal proximity based on the ongoing litigation that began in June 2009. However, this would subject employers to continuous risk of retaliation suits once litigation commences. Moreover, the D.C. Circuit does not appear to require such an expansive temporal proximity standard. *See Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (rejecting argument that action two and one-half months after filing of first lawsuit demonstrated sufficient temporal proximity).

[29] Sam Samimi's testimony on this point differs slightly, but may ultimately be consistent. In response to a question about when IT and security were taken from Bergbauer, Sam Samimi testified "It pretty much started when Mr. Deskins came into the position . . . that's when it *slowly* started . . . and then they broke up the position." Pl.'s Opp'n, Ex. N, at 51 (emphasis added). This testimony is not specific enough to suggest that the change in her responsibilities occurred earlier than the date reported by McKay.

objective rating . . . .").   Moreover, the performance review itself provides a number of justifications for the rating, including conflicts Bergbauer had with some of her staff and other Navy employees, and her failure to complete certain tasks.   Def.'s MSJ, Ex. 10, at 10, 16. Bergbauer disputed some justifications for the review, *see* Pl.'s Opp'n, Ex. E, at 3–6 (suggesting two of the employees who complained had a history of low performance and complaints against supervisors, and suggesting that certain delays were attributable to failures by others); however, she also agreed with the assessment of her "poor communication with SEA 10" and stated that the SEA 10 HR Specialist obviously didn't like her, *see id.* at 5–6 (suggesting that she should not blamed for this).   The record suggests that Bergbauer's first request for reconsideration of her rating was denied by the Pay Pool Manager, which further weakens the inference of retaliatory motive on Deskins' part.   *See* Pl.'s Opp'n, Ex. E (appealing decision on request for reconsideration of rating); Def.'s MSJ, Ex. 10 (listing Wilmot Summerall as the "Pay Pool Manager" on the associated review form).

The Court is troubled by RDML McManamon's statement, in July 2008, that he could influence Bergbauer's performance reviews if she did not keep him happy.   Despite Navy's recent assertion that Bergbauer has "failed to present any evidence that McManamon knew that she had alleged harassment by Goddard," Def.'s Reply 12, ECF No. 64, Navy has essentially conceded this point by stipulating that McManamon said, "you're not going to do to me what you did to the other admiral."   Def.'s SMF ¶ 18.   Making all reasonable inferences in favor of the nonmoving party at this stage, the Court infers that McManamon was aware of Bergbaeuer's complaint by early July 2008.   Nevertheless, Bergbauer has presented no evidence that McManamon ever followed through on his threat.   The conversation between Bergbauer and McManamon was private and took place behind closed doors in McManamon's office.

Bergbauer nowhere asserts, much less provides evidence, that McManamon communicated this to Deskins or her other supervisors or acted on it in any way.

The Court also does not believe that Bergbauer has satisfied her burden to show a causal connection between Deskins' request that she be "fired and arrested" for allegedly harassing another employee.  The record suggests that this request occurred around the end of June, when the NAVINSGEN report was released, before Deskins became Bergbauer's supervisor and before he knew of her protected activity.  *See* Pl.'s Opp'n, Ex. D, at 105–08.  However, given the Court's uncertainty about the facts surrounding this event, the Court will nevertheless include it in the analysis below.

b.      Remaining alleged harassment not actionable

With respect to the other alleged retaliatory events, the Court finds that Bergbauer has met the minimal burden of showing that they were committed by actors who knew of her protected activity and that they were temporally close to that activity. [30]  The remaining allegations include: McManamon's comment regarding Bergbauer's performance reviews (assuming that this should be considered as a separate retaliatory act and not solely as evidence of McManamon's retaliatory intent); McManamon's reassignment of Bergbauer to work with Deskins, despite knowing that the two did not get along; Goddard's announcement to various staff that Bergbauer had "gone after him"; and various acts by Deskins.

Based on the standard used in this Circuit, Bergbauer has failed to show that she was subjected to a hostile work environment.  "The key terms . . . are 'severe,' 'pervasive,' and 'abusive,' as not just any offensive or discriminatory conduct rises to an actionable hostile work

---

[30] Although Bergbauer does not provide exact dates for the alleged retaliatory actions by Deskins, the actions largely track those she complained of in her September 2008 EEO complaint.  See Def.'s MSJ, Ex. 9.  Thus, the actions had to have occurred between July 2008 when Deskins became her supervisor and learned of her protected activity and September 2008.  This is sufficient to show a temporal connection.

environment." *Bell v. Gonzales*, 398 F. Supp. 2d 78, 91–92 (D.D.C. 2005).  In assessing hostile work environment claims, courts look to the totality of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris*, 510 U.S. at 23.

It seems that all of the remaining conduct took place over just three to six months, from July 2008 to September 2008 or January 2009, and does not appear to have continued beyond that period.  *See supra* n.31; Pl.'s Opp'n, Ex. D, at 151; Def.'s MSJ, Ex. 11.  While this strengthens an inference that the conduct was frequent, it also undercuts the argument that it was particularly severe.

Only some of the incidents come close to being threatening, humiliating, or insulting.  First, the statement by McManamon regarding Bergbauer's performance reviews appears to be at least somewhat threatening.  However, Bergbauer has presented no evidence that McManamon ever communicated his threat to her supervisors or tried to intimidate her further.  Deskins' comparison of Bergbauer to sandpaper does not appear particularly insulting, especially since he compared himself with sandpaper as well.  Further, Deskins request that Bergbauer be fired and arrested was not made in her presence and she only learned of it from another employee.  See *Jones v. Billington*, 12 F. Supp. 2d 1, 12 (D.D.C. 1997) (plaintiff's report that he heard that racial remarks were being made against him, but not in his presence, was not sufficiently severe as to create a hostile working environment).  Finally, the comment by Goddard was admittedly highly unfortunate and unprofessional and it likely embarrassed Bergbauer.  However, Bergbauer does not provide the Court with sufficient information to determine the real impact of the remark.  She states that it was humiliating in part because Goddard said it just days after a *Navy Times* article

that included "explicit and embarrassing details" of the San Diego trip.  However, that article has

not been provided to the Court and the only relevant article the Court can find was not published

until September 2008.[31]

Most of the remaining incidents are the types of work-related disputes not actionable as a

hostile work environment claim.  For example, McManamon reassigned Bergbauer to work for a

supervisor with whom she did not get along.  However, Bergbauer has presented no evidence,

other than her own speculation, to suggest this was retaliatory.  Moreover, the reassignment was

made upon the retirement of her previous supervisor.  This is the sort of personnel decision that

employers routinely make.   The other incidents complained of include that: Deskins gave

Bergbauer short time periods in which to complete assignments; he did not stand up for her when

an admiral complained about something she had done at Deskins' direction; he did not keep her

informed about work-related matters; he canceled at least one work trip at the last minute.  These

simply do not rise to the level of "severe or pervasive" as defined in our Circuit.  Even if the

Court were to consider the "poor" performance review by Deskins in this analysis, the review is

exclusively concerned with actual work performance.  It contains no abusive language and

presents, in a fairly detached fashion, the areas in which Deskins believes that Bergbauer's work

performance was not up to par.  Occasional instances of less favorable treatment involving

ordinary daily workplace decisions are not sufficient to establish a hostile work environment.[32]

---

[31] Moreover, Goddard had been relieved of his position at the time he made this announcement and was not acting in a supervisory capacity, thus, vicarious liability would depend on whether Navy knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action.  Given that this was a one-time comment and that Navy promptly investigated Goddard's comment, Pl.'s Opp'n, Ex. Q, it appears unlikely that Navy could be held liable based on this comment.

[32] *See Brooks v. Grundmann*, 851 F. Supp. 2d 1, 6–7 (D.D.C. 2012) (holding that no reasonable jury could find a hostile work environment where supervisor gave plaintiff negative performance appraisals, criticized her, increased scrutiny of her work, raised his voice during meetings, slammed his hand on the table, angrily threw a notebook in her direction, and placed her in a "Team of One," which isolated her from her coworkers); *see also id.* at 6 ("[N]on-selection for a desirable position, assignment to undesirable duties, sharing a small office, and being criticized by supervisors do not establish a hostile work environment." (citing *Veitch v. England*, 471 F.3d 124, 130–31 (D.C. Cir.

Moreover, although Bergbauer met the minimal burden of showing temporal proximity with respect to Deskins' actions, the record suggests a lack of causal connection between the actions and Bergbauer's protected activity. First, there is evidence of a personality conflict between Deskins and Bergbauer even prior to her protected activity and prior to her being assigned to work under Deskins. *See* Pl.'s Opp'n, Ex. D, at 72 ("Our operating methods never were cohesive; they were always in direct conflict with each other."). Bergbauer herself alleges that Deskins had poor communications skills and could not lead, which would suggest that the complained-of conduct was less a response to Bergbauer's protected activity and more a function of Deskins' management style. Pl.'s Mem. P. & A. at 17 (citing Pl.'s Opp'n, Ex. I, at 4.). Deskins also appears to have had conflicts with a number of other employees, not just Bergbauer. *See* Stmt. of Tammy Bergbauer, Pl.'s Opp'n, Ex. D, at 30 ("[Deskins] didn't like

---

2006)); *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) (finding insufficient to state a hostile work environment claim plaintiff's allegations that "management passed him over for performance awards, lowered his performance evaluations, unfairly reprimanded and criticized him, made disparaging remarks about his EEO complaints, closely scrutinized his work, refused him a window cubicle, removed some of his duties, . . . denied his requests to travel or otherwise failed to provide support for his work with staffing and funding[, . . . ] den[ied] a noncompetitive promotion, den[ied] a within-grade increase, and oppos[ed] his transfer to another office or detail assignment"); *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 78–82 (D.D.C. 2007) (finding insufficient to state a hostile work environment claim allegations of denial of personnel and other resources, investigations and monitoring of plaintiff, undermining of plaintiff's authority by excluding him from communications and meetings and cutting him out of the chain of command, allegedly discriminatory comments and/or threats; and an alleged "demotion" to a different position); *see also id.* ("[These] are the type of employee grievances that can reasonably be expected to arise in every workplace. These affronts may understandably have made plaintiff unhappy, but they are nothing more than the 'ordinary tribulations of the workplace' which Title VII is not available to redress." (quoting *Faragher*, 524 U.S. at 788)); *Bell v. Gonzales*, 398 F. Supp. 2d 78, 92 (D.D.C. 2005) (granting summary judgment to defendants where defendants "allegedly treated plaintiff as a 'problem personality,' blamed him for workplace conflict, monitored his behavior more closely than that of other employees, excluded him from the informal chain of command and staff meetings, restricted his travel and teaching assignments, restricted his high visibility projects, reprimanded and criticized him, . . . spoke to him in derogatory terms (e.g., referring to plaintiff as having "emotional problems" and calling him an "idiot") . . . and reassign[ed] plaintiff"); *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 56 (D.D.C. 2004) (supervisor's criticism of plaintiff's work and manner of addressing her as well as nature of work assignments and opportunities afforded to plaintiff were not severe or pervasive and instead were the "kinds of normal strains that can occur in any office setting"); *Richard v. Bell Atlantic Corp.*, 209 F. Supp. 2d 23, 35 (D.D.C. 2002) ("'[T]he type of conduct that [Ms.] Walton complains of, i.e., rude comments, unjust criticism, and stressful working conditions, amount to "ordinary tribulations of the workplace" that [is] insufficient as a matter of law for a hostile environment case.'"); *cf. Singletary*, 351 F.3d at 528–29 (remanding to the district court for a finding on the question of hostile work environment when the plaintiff had been forced to work in an unheated, unventilated storage room containing brooms and boxes of debris when more suitable office space was available).

contractors and more than half of my staff at that time was contractors.  He spoke down to them constantly.").  Additionally, Bergbauer's own statements suggest that Deskins' actions may have represented an attempt to gain power for himself rather than to retaliate against her.  *See* Pl.'s Opp'n, Ex. D, at 70 ("Mark Deskins wanted control of Corporate Ops, had ever[] since he came on board—in my opinion because he had no job and so he was looking for one . . . [and] positioning himself to realign himself as a supervisor of Corporate Ops . . . .").

With respect to the letter of reprimand, the record suggests a legitimate basis for the action.  The letter was issued in response to an email from Bergbauer to Deskins.  In that email, she wrote, "I fail to recognize what part of my original reply you are unable to comprehend . . . . The fact that, yet again, you have taken it upon yourself to interject yourself into a situation regarding a member of my staff which you know little about . . . remains inconceivable in my mind."  Def.'s MSJ, Ex. 11, at 1–5.  Surely, a reasonable supervisor could perceive such comments from a subordinate to be sufficiently "insolent" and "disrespectful" to merit a letter of reprimand.  Further, Bergbauer presents no evidence to suggest that others behaving similarly were able to avoid reprimands.

To the extent that Bergbauer attempts to point to the deposition testimony of others to show a general "atmosphere of retribution," including "rumors" and "audible expletives" from co-workers, this would not support her claim.  *See* Pl.'s Opp'n 10–11, 19–22 (quoting fact witnesses discussing a generally negative "atmosphere" and comments made outside of Bergbauer's presence).  Comments made outside of the employee's presence are generally not actionable as the basis for a hostile work environment claim. *See Mason v. Southern Ill. Univ. at Carbondale,* 233 F.3d 1036, 1046 (7th Cir. 2000) (holding no hostile environment where co-worker told plaintiff that other employees had used racial epithets and that 'through the

43

grapevine' or 'second-hand' conduct is not sufficiently severe or pervasive); *Billington,* 12 F. Supp. 2d at 12.

Although Bergbauer cites this Court's prior Memorandum Opinion in support of her claim, she misconstrues the decision.  It is true that the Court stated, that "[Bergbauer] paints a picture of hostile supervisors isolating her from coworkers and, ultimately, causing her to receive a pay reduction by means of warrantless reprimand letters and retaliatory performance reviews." However, this sentence was housed between two sentences which made clear that (1) the Court was examining Bergbauer's claims in the context of a motion to dismiss; and (2) the Court was reciting only what Bergbauer had *alleged*, not its own conclusions.  *See* Mem. Op. 12–13 ("Bergbauer has said enough . . . to survive a motion to dismiss. . . .  Whether this pattern of conduct is as severe and pervasive as she makes it out to be will be determined through discovery.").  With discovery now complete, the Court holds that the conduct is not severe or pervasive to make out an actionable hostile work environment claim.

Finally, Bergbauer argues that that whether conduct was sufficiently severe or pervasive is a question for the jury.  Pl.'s Mem. P. & A. 40.  While she cites two cases to support this assertion, *Armstrong v. Reno*, 172 F. Supp. 2d 11, 23-24 (D.D.C. 2001) ("Very rarely will such fact-based determinations be appropriate for determination on summary judgment."); *Wade v. Wash. Metro. Area Transit Auth.*, CIV. 01-0334 (TFH), 2005 WL 1513137 (D.D.C. June 27, 2005) ("This analysis is the type of fact intensive inquiry that is the province of the jury. . . . Once there is evidence of improper conduct and subjective offense, as there is here, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury."), the fact remains that courts in our circuit routinely decide Title VII hostile work environment claims on motions for summary judgment.  *See supra* n.32.  "Rule 56(c) mandates

the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## IV.    CONCLUSION

For the reasons above, the Court will GRANT Navy's motion for summary judgment. Although Bergbauer sufficiently exhausted her hostile work environment claim based on sexual harassment, she cannot show that the harassment was sufficiently severe or pervasive to rise to the level of a hostile work environment.   Similarly, Bergbauer has not shown conduct sufficiently severe or pervasive, or with the required causal nexus, to make out a claim of retaliatory hostile work environment.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on March 27, 2013.